Filed 7/22/25  P. v. Lopez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. JESSICA LYNN LOPEZ, Defendant and Appellant. | D082880 (Super. Ct. No. SCN304686-1) |


APPEAL from an order of the Superior Court of San Diego County, Robert Kearney, Judge.  Affirmed.

Raymond M. DiGuiseppe, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa Mandel and Anne Spitzberg, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

Jessica Lynn Lopez, who was convicted in 2015 of first degree special circumstance felony murder, appeals a trial court ruling finding her ineligible for resentencing under former section 1170.95 of the Penal Code,[1] now section 1172.6. The trial court based its denial on the determinations the evidence proved beyond a reasonable doubt both that Lopez was a major participant in the kidnapping and torture of the decedent who acted with reckless indifference to human life and that she directly aided and abetted the murder with malice aforethought. Lopez argues the evidence presented at the evidentiary hearing was insufficient to support finding her guilty of murder under current law. We conclude otherwise and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### *Trial Evidence*

Following the death of Brittany Killgore, in 2015 a jury convicted Lopez, as well as her codefendants Louis Perez and Dorothy Maraglino, of first degree murder (§ 187, subd. (a); count 1); kidnapping (§ 207, subd. (a); count 3); torture (§ 206; count 4); and attempted sexual battery by restraint (§§ 243.4, subd. (a) & 664; count 5). As to all three defendants, the jury found true the special circumstance that the murder was committed during a kidnapping (§ 190.2, subd. (a)(17)(B)). The jury also convicted Perez and Maraglino of conspiracy to commit kidnapping (§§ 182, subd. (a)(1) & 207; count 2), but it acquitted Lopez of this charge.

Lopez (as well as Perez and Maraglino) appealed, challenging the sufficiency of the evidence supporting each of her convictions, among other

---

[1]     Further unspecified statutory references are to the Penal Code.

claims raised. On December 29, 2017, we issued our opinion rejecting her challenges and affirming the judgment. (*People v. Maraglino* (Dec. 29, 2017, D069297, D069609) [nonpub. opn.].) The following summary of the trial evidence underlying Lopez's convictions is taken from that opinion.

"On April 13, 2012, Perez picked up Killgore from her apartment under the pretext of taking her on a dinner cruise. Ten minutes later, Killgore sent her friend a text message saying, 'Help.' Four days later, detectives recovered her nude body near Lake Skinner in Riverside County. Evidence presented at trial suggested Killgore died while defendants were acting out a BDSM kidnapping fantasy.

"Perez, Maraglino, and Lopez were active participants in the BDSM lifestyle, respectively occupying roles in their household of 'master,' 'mistress,' and 'slave.' Perez and Maraglino were in a dominant-submissive relationship wherein Perez was the dominant and Maraglino was his submissive. Perez lived in a separate residence but often visited Maraglino at her home in Fallbrook, California. Lopez was Maraglino's slave and lived in Maraglino's home.

"As a masochist, Lopez enjoyed receiving pain; Maraglino would inflict pain on her through BDSM 'play.' Although a slave in the Maraglino household, Lopez had been a dominant in the past and in an ongoing online relationship with someone named Bella. Maraglino was a 'switch,' meaning she was submissive with Perez and dominant with Lopez. Maraglino established written procedures, including a 'House Manual,' 'Perfect Slave Checklist,' and slave contract. She controlled everything Lopez did inside and outside the home; Lopez wore a dog collar stating she was Maraglino's property. As Maraglino's master, Perez had control over Maraglino's household, including control over Lopez.

3

"Perez was a sadist and enjoyed inflicting pain on others. . . . Although there was testimony Perez was considered a 'safe' player in the BDSM community who acted only with consent, detectives found a video of Perez beating a woman with various implements as she begged him to stop and continuing to beat her past the point of consciousness.

"All three defendants had BDSM abduction, torture, and murder fantasies. Lopez's diary contained a ciphered writing in which she abducted, tortured, and killed someone she disliked, disposing of the body and dousing evidence with bleach. Maraglino authored a writing about abducting three generations of women, each one 'prescribed a method of death' and subjected to sexual torture, torture, and forced suicide. Maraglino authored a separate writing, found in Perez's garage, in which she slit the throat of a woman while that woman was having sex with Perez. Maraglino made a handwritten list of 'hunting ground[s]' for vulnerable victims that included ways to dispose of a body and avoid detection. Perez and Maraglino discussed their abduction fantasies with Dora B., another of Maraglino's slaves, on two or three occasions. At one point, Maraglino asked Dora how she would react if a kidnapped woman were brought to the home. Dora worried these fantasies 'didn't always take consent into account,' but she 'wanted to believe that it was nothing more than a fantasy.'

"Perez and Maraglino acted out an abduction fantasy on Nicole A. Without prior agreement, Perez and Maraglino picked up Nicole in a parking lot, blindfolded her, undressed her in the 'dungeon' in the basement of Maraglino's home, restrained her, and engaged in BDSM play. Thereafter, Nicole voluntarily joined the household for a short period as Maraglino's slave.

4

"Perez and Maraglino had an open relationship, but Maraglino was paranoid about losing him to another woman. Nicole's relationship with Maraglino soured because Nicole communicated with Perez directly, rather than go through her. As their relationship deteriorated, Maraglino made threatening statements toward Nicole's daughter. When Perez began seeing Marina V., Maraglino talked about killing Marina and wanting her to die a torturous death; in an online forum, she threatened to kill Marina and Marina's daughter. Perez and Maraglino briefly broke up over Marina; they soon rekindled their relationship and in 2011 conceived a child.

"Although there was some evidence the relationship between Perez and Maraglino became more conventional after they reunited, there was also evidence they remained involved in BDSM. Lopez remained Maraglino's slave. Maraglino kept her BDSM toys and, on the day of Killgore's disappearance on April 13, 2012, sent Deborah E. a text message about a forced lactation-torture fantasy. . . . On the day before Killgore's disappearance, Perez texted Al.E. about upcoming plans to engage in BDSM play with someone he did not like, which to Al.E. was a 'very big red flag.' Al.E. told Perez not to go through with it, but he said it would give him 'control to temper my feelings and not hurt[ ] someone I want to hurt badly.'

"Killgore's close friend, Elizabeth Hernandez, became friends with Maraglino in 2011. Hernandez would often visit Maraglino's home and bring Killgore with her. Killgore and Hernandez were not involved in BDSM, but both knew that defendants were. Although Maraglino was initially friendly with Killgore, she became hostile toward her after she perceived Killgore flirting with Perez. Maraglino called Killgore 'the disease' and 'the herpes' when she was not around; asked why Hernandez and Killgore were always together; and seemingly in jest, offered to get rid of Killgore for

5

Hernandez. [¶] . . . [¶] Lopez appeared to have a better relationship with Killgore, but she, like Maraglino, called Killgore 'the disease' and 'herpes' and joked, on April 13, 2012, that she would make Killgore walk the plank at her pool party the next day.

"On the afternoon of April 13, 2012, Hernandez visited Maraglino's home to return a camera charger. She stayed to socialize with Maraglino and Perez; Lopez was not home. Maraglino seemed excited to hear Killgore was going to move to the east coast, saying Hernandez would finally be 'free.' Hernandez told Perez and Maraglino about her recent excursion on the Hornblower dinner cruise in San Diego. She said Killgore seemed very interested in going, and she wanted to take Killgore on a cruise before she moved. Hernandez recalled nothing out of the ordinary about her conversation. Perez and Maraglino did not mention having tickets or plans to go on a dinner cruise that evening.

"Killgore and Hernandez lived in the same apartment complex on Ammunition Road in Fallbrook, as did friends Channy Tal . . . and Jessica Perry. At 4:38 p.m.[2] on April 13, 2012, Perez knocked on Killgore's door. Tal was in the apartment, helping Killgore pack for her upcoming move. Killgore asked Perez how he knew where she lived; Perez replied that he had 'asked around.' Perez pressed Killgore to come with him on the Hornblower dinner cruise that night, saying he had two tickets but nobody to go with. Killgore declined. Perez gave Killgore his phone number, and security footage showed him leaving the complex at 4:54. When leaving the apartment, Perez texted Maraglino, 'That guy wasn't successful,' to which Maraglino replied, 'Tomorrow is another day.'

---

2       "All times are p.m. unless otherwise noted."

6

"A few minutes after Perez left, Killgore texted to ask if he knew anyone who could help move her belongings. At 5:00, Perez texted Killgore, 'Party with me tonight & you'll have five guys there in the morning.' Killgore replied that she would welcome help moving but felt 'weird about the partying' because she did not think Maraglino would like it.

"Killgore told Tal she was uncomfortable accompanying Perez because he was in a relationship with Maraglino. Perez responded to Killgore's text, saying Maraglino was 'ok with it' and suggesting at 5:19 that Killgore text her to confirm. Killgore replied at 5:26 that she did not know Maraglino's number and did not think Maraglino liked her. Perez reassured Killgore that was not the case and gave her Maraglino's number. At 5:39, Perez checked in to see if Killgore had contacted Maraglino. Killgore replied two minutes later that she had not but would. At 5:42, Maraglino searched the Internet on her phone for 'San Diego dinner cruise.' A minute later, Perez texted Killgore to say he was 'dressing up to go to dinner on the hornblower.'

"Killgore called Maraglino and left a voicemail message at 5:55. Maraglino called back ten minutes later, and Tal overheard their conversation. Maraglino seemed friendly and was laughing; she told Killgore to go with Perez on the cruise because she was pregnant and would get seasick. After speaking with Maraglino, Killgore decided to go. She told Tal she had no interest in Perez, but thought it would be her last chance to go on the dinner cruise before she moved to Pennsylvania the following week.

"Killgore texted Perez around 6:10 agreeing to go, asking what time he would pick her up and when his friends would help her move. At 6:12, Maraglino searched the Internet on her cell phone for 'Hornblower San Diego.' Perez sent Killgore texts at 6:15 and 6:19 asking her to be ready at 7:30 that night and stating his friends would help her move in the morning.

7

At trial, the parties stipulated that on April 13, 2012, the Hornblower cruise left the dock in San Diego at 7:00, meaning it would not have been possible to make it if they left Fallbrook at 7:30, and that Maraglino, Perez, and Killgore did not have tickets for the cruise.

". . . At 6:38, Killgore texted Hernandez that Perez had stopped by to ask her out and it was 'odd.' Hernandez followed up, and Killgore texted her at 7:30 that Perez was taking her '[t]o the [H]ornblower and a casino' after Maraglino had given permission. Hernandez testified that this plan confused her because Perez and Killgore hardly interacted.

"At 7:31, Perez sent Killgore a text message saying, 'I'm running late be there in five minutes, can you meet me at the curb? I got stopped at the front gate.' . . . Killgore responded, 'At the curb? It's raining you know. Id [*sic*] appreciate it if you drove into the complex.' Perez responded, 'It's not. I don't want to miss our boat.' Perez called Killgore and evidently agreed to drive up to her complex. Surveillance footage showed Perez entering the complex at 7:36. At 7:37, Perez texted Killgore, 'I'm here,' and Killgore responded, 'I'm out now.' At 7:39, Killgore texted Perry that she was going with Perez on a dinner cruise and might stop by to visit Perry afterwards. Surveillance footage showed someone getting into the passenger side of Perez's car; the car pulled out of the lot around 7:40. Perez testified that he then drove Killgore to Maraglino's home to pick up a flier, and a neighbor recalled Perez's car swerving up to Maraglino's residence near dusk.

"At 7:50, ten minutes after leaving her apartment complex with Perez, Killgore sent Tal a text message that read, 'Help.' Killgore's cell phone was closer to Maraglino's house than to her apartment when she sent that text. At 7:57, Perez texted Maraglino, 'Kitten?' At that point, Maraglino and Lopez were shopping at a grocery store located just minutes away from

Killgore's apartment and about 5 to 15 minutes from Maraglino's home (depending on traffic). Around 7:58, Lopez left the store to retrieve her wallet from Maraglino's home while Maraglino waited at the checkout aisle.

"Around 8:00, Tal tried three times to contact Killgore. At 8:05, she received a text from Killgore's phone stating, 'Yes I love this party.' Tal was suspicious because the message did not resemble Killgore's texts. She demanded Killgore call her so she could hear her voice. Tal received another suspicious text message from Killgore's phone at 8:07 that said, 'In a few hot guys.' Tal insisted Killgore call her immediately, and Killgore's phone made two short calls to Tal at 8:09 and 8:10. Tal texted Killgore that she could not hear her when she called, and Killgore's phone sent Tal a message stating, 'Its ok music is too loud.' At trial, Perez admitted using Killgore's phone to call her friends while playing loud background music from his car.

"Meanwhile, Maraglino, who remained at the grocery checkout aisle, left missed calls on Lopez's phone at 8:07 and 8:09. At 8:10, Maraglino stepped outside and returned a few seconds later with Lopez. At 8:11, Perez texted Maraglino, 'Come home,' suggesting he was then at Maraglino's home. At 8:12, Lopez and Maraglino were seen on video leaving the grocery store.

"Killgore's friends grew very concerned. At 8:14, Hernandez called Killgore; cell location data placed Killgore's phone near Maraglino's house at that time. At 8:21, Hernandez called Maraglino, who lied that she had not spoken to Killgore that day. At 8:30, Tal texted Killgore, demanding she call her. At 8:40, Perry called Perez, who told her he had left Killgore downtown at a club. Perez told Perry he had last seen Killgore talking to some guys outside the club. He kept repeating that Killgore's face looked okay, which struck Perry as odd. Cell location data indicated Perez and Lopez were both in the vicinity of Maraglino's home in Fallbrook up to this point.

"Maraglino, who previously worked for a cell phone company, told Perez that cell phones were traceable. Perez then decided to dispose of Killgore's phone in downtown San Diego to corroborate the story he had told Perry. At 9:20, cell location data showed Perez driving southbound from Fallbrook toward San Diego. Perez had Killgore's phone with him. While driving south on the I-15, Perez texted Killgore 'Where are you?' and 'You're friends are calling me worried.' He texted Maraglino asking about her night, and Maraglino replied that she was having a quiet night at home. Perez later admitted to using Killgore's phone to send text messages to her friends. At 10:10, Tal tried again to call Killgore and texted, 'Should I just call the cops.' Killgore's phone responded from a downtown San Diego location, 'Im ok.' Perez's license plate was photographed downtown by a San Diego Police Department license reader at 10:34. Perez's phone and Killgore's phone remained downtown until 10:51, when Perry tried again to reach Killgore.

"At 11:02, Perez called Perry as he was driving north from San Diego toward Fallbrook. Perez sounded frantic and told Perry he had been driving around looking for Killgore. Perez returned to Maraglino's home after midnight. Thereafter, cell data showed Perez's and Lopez's cell phones moving east toward Temecula. In the early hours of April 14 [(specifically, between 3:41 a.m. and 4:32 a.m.)], both Perez's and Lopez's cell phones were traced near Lake Skinner and later [were] traced returning toward Maraglino's home. At trial, Perez [testified it was Lopez who killed Killgore. He] explained that he and Lopez wrapped Killgore's corpse in a tarp and put it in a trailer that they hitched to Perez's car. Perez drove the trailer to Lake Skinner, with Lopez tailing his car to cover the trailer's missing license plate, and the two dumped the body near Lake Skinner.

"On the morning of April 14, Hernandez confronted Maraglino, saying she knew Maraglino had spoken to Killgore the previous day. Maraglino stuttered and gave the phone to Perez. During the call, Perez changed his story two or three times as to what had happened the previous night.

"Tal and Hernandez . . . called the sheriff's department. Perez called Hernandez around noon and offered to drive her around to look for Killgore; Hernandez told him law enforcement had already arrived. Sheriff's Deputy James Breneman called Perez, who sounded panicked but offered to come talk in person.

"Perez drove to Killgore's apartment complex on the afternoon of April 14. . . . [He] told detectives Killgore was flirty, flighty, and that she had been drinking; Killgore's friends did not agree with these characterizations. Perez claimed he had left Killgore downtown at a club the night before and that Killgore had texted him, 'I'm okay.' Deputy Breneman was suspicious when he did not find that text on Perez's phone. He also found it strange that Perez's car was caked with fresh mud, given the heavy rains the night before. Perez agreed to provide a voluntary statement at the sheriff's department and was transported there. He consented to a search of his vehicle and was placed under arrest when deputies found an unlawful weapon inside. . . .

"Deputies searched Maraglino's home on April 15 and 16. On April 16, Lopez and Maraglino were gone, and some items seen the previous day were missing, as if someone had cleaned up. The sheriff's department authorized a search for Maraglino's truck, which bore the license plate, 'Ivnsktn' ('Ivan's Kitten,' indicating Maraglino was Perez's 'Kitten'). Deputies found the truck on April 17 at a hotel parking lot near the San Diego airport. They forcibly opened a room booked under Maraglino's name and found Lopez, bleeding at the neck and half naked after an apparent suicide attempt. In the room were

three copies of a seven-page handwritten confession letter by Lopez, with a sign above stating, 'Pigs read this.'

"In the letter, Lopez used derogatory language, describing Killgore as a 'miserable cunt' who had tried to come between Perez and Maraglino. Lopez took complete responsibility for Killgore's death, saying sheriffs had arrested the 'WRONG FUCKING PERSON' in Perez. Lopez claimed she alone had grabbed Killgore; slammed her body into the stairs; restrained her wrists, ankles, and mouth; subdued her with a Taser; wrapped rope around her neck to apply and release pressure; attempted to hack up the body with power tools; doused the body with bleach; and dumped the body near Lake Skinner. The letter described injuries that would likely be found on Killgore's body— ligature marks around her neck and wrists, a Taser mark near her neck, and bruising and mutilation marks.[3] Lopez expressed her love to Maraglino as her slave and pet; sheriffs found a dog collar in the room marking Lopez (alias Rosalin) as 'Property of Ms. Dee [Maraglino].' There were three copies of the confession letter in the hotel room, one addressed to 'Master Ivan' (Perez), another to 'My parents,' and a third to a local media station. Surveillance video showed the hotel receptionist making copies of the letter for Lopez the previous night. Maraglino was in the hotel when Lopez had her letter copied and departed San Diego on the morning of April 17 to visit family in Virginia. Deputies accompanied Lopez to the hospital, and she was arrested thereafter.

---

3 "The letter also contained statements that did not correspond with other evidence, including that the murder happened after 11:15 and that Killgore, who did not drive, appeared suddenly at the residence to demand sex with Perez."

12

"Based on Lopez's letter, deputies focused their search team on the Lake Skinner area in Riverside County. Later that afternoon on April 17, deputies found Killgore's nude body about a mile from Lake Skinner. The medical examiner determined the cause of death to be ligature strangulation, with hemorrhaging in her eyes consistent with pressure being intermittently applied and released over a long period. The cricoid cartilage of Killgore's neck had been fractured, indicating someone had applied more than 33 pounds of pressure on her neck. There were bruises on her legs, a bruise outside her left wrist consistent with the use of handcuffs, two cuts forming a 'T' on her left wrist, and five small pinprick marks on the left side of her face, consistent with the use of a stun baton. In addition, there was a deep postmortem cut to Killgore's left knee with marks consistent with the use of a power saw. The lack of maggots was consistent with the wound having been doused with bleach. There were postmortem abrasions on Killgore's back, consistent with the body being rolled down the embankment. There were no internal or external injuries to Killgore's genitalia.

"As lead sheriff's detective Brian Patterson was driving to Lake Skinner on April 17, Maraglino called him to say that she and Lopez ordered a movie on cable on April 13 called 'Adventures of Rin Tin' and had spent the night in. Her cable records later indicated she rented 'Tintin' on April 14 and did not rent any movies on the 13th. Maraglino hung up after Patterson pressed her on inconsistencies with Perez's account, insisting that he could not get her to contradict Perez.

"Officers searched Maraglino's home again on April 19. They recovered the roll of plastic mentioned in Lopez's letter and photographed a reciprocating saw blade in a drawer near the hallway. They also recovered

13

various images, videos, documents, and BDSM implements from the home. . . .

"A later search of Perez's vehicle revealed a plastic bag containing food wrappers, disposable gloves, a piece of plastic, and a stun baton in working condition.  There was blood on the plastic gloves, pieces of plastic, and the plastic bag matching Killgore's DNA.  Swabs from the piece of plastic and the gloves matched Perez's DNA.  The stun baton contained Perez's DNA on the straps and handle and Killgore's DNA on the prongs.  There was no semen found in Perez's car.  Tire treads from Perez's car were a possible match to the treads found near Killgore's body at Lake Skinner.

"Sheriff's deputies ultimately found no evidence of blood or semen at Maraglino's home.  They recovered a rope and knife from Maraglino's truck but could not connect those items to Killgore's murder.  They also recovered from Maraglino's truck a receipt for cleaning products, water, paper towels, and rubber gloves purchased on April 14.

"A special agent with the Naval Criminal Investigative Service searched Perez's home on base and found additional BDSM writings, including Maraglino's throat-slit fantasy writing.  Maraglino's cell phone was found a year and a half later, cleared of text data, disassembled, and underneath several suitcases in a closet in her brother's house in Missouri.  The clothes worn by Maraglino, Perez, and Killgore on April 13 were never recovered.

"At trial, Perez admitted he had lied to Perry and detectives about taking Killgore downtown, and he admitted taking Killgore's cell phone downtown to match that story.  He claimed he had lied to protect Maraglino but denied doing so to give her more time to clean up.  Perez admitted he had misled Killgore into believing they were going on a cruise long after they had

already missed it in order to get her into his car. He also admitted telling Becky Z. on October 17, 2013, 'everybody had a role to play that night, including myself.' On redirect, Perez explained this statement referred only to his role in the cover-up and that he had also told Becky, 'I didn't kill anybody.' "

"Lopez did not present any testimony in her case-in-chief; her counsel argued she was the perfect slave or patsy—a masochist, not a sadist—and there was no evidence she had any role besides authoring a confession-suicide letter to protect her mistress and master. . . .

"Following deliberations, on October 21, 2015, the jury convicted Perez and Maraglino [and Lopez as described above]."

"On January 8, 2016, the court sentenced Lopez to LWOP on count 1, life with possibility of parole on count 4, a stayed term on count 3 pursuant to section 654, and a two-year upper term for count 5."

## II.

### *Change in the Law Governing Felony Murder*

In 2018, our Legislature enacted Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437), which "significantly limited the scope of the felony-murder rule to effectuate the Legislature's declared intent 'to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' " (*People v. Strong* (2022) 13 Cal.5th 698, 707–708 (*Strong*).) As amended, the law "limits liability under a felony-murder theory principally to 'actual killer[s]' ([§] 189, subd. (e)(1)) and those who, 'with the intent to kill,' aid or abet 'the actual killer in the commission of murder in the first degree' (*id.*, subd. (e)(2))." (*Strong*, at p. 708.) "Defendants who were neither actual

killers nor acted with the intent to kill can be held liable for murder only if they were 'major participant[s] in the underlying felony and acted with reckless indifference to human life.' "[4] (*Ibid*.)

Senate Bill 1437 also created a procedural mechanism for those convicted under the former law to seek relief under the law as amended. (*Strong*, *supra*, 13 Cal.5th at p. 708; former § 1170.95, now § 1172.6.) Defendants seeking such relief may initiate the process by filing a petition declaring "that '[t]he petitioner could not presently be convicted of murder . . . because of [the] changes to . . . [s]ection 188 or 189.' " (*Strong,* at p. 708.) If the trial court determines the petition establishes a prima facie case for relief, it issues an order to show cause and the matter proceeds to an evidentiary hearing at which the prosecution bears the burden of proving beyond a reasonable doubt that the petitioner is guilty of murder under the

_____

[4] Our Supreme Court has identified factors that are to be considered in determining whether an individual was a major participant in a felony who acted with reckless indifference to human life. The following non-exclusive factors are used to determine whether a defendant was a major participant in the felonies that resulted in death: (1) the defendant's role in planning the criminal enterprise that led to one or more deaths; (2) the defendant's role in supplying or using lethal weapons; (3) the defendant's awareness of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants; (4) whether the defendant was present at the scene of the killing, in a position to facilitate or prevent the actual murder, or play a particular role in the death; and (5) the defendant's conduct after lethal force was used. (*People v. Banks* (2015) 61 Cal.4th 788, 799–803 (*Banks*).) The following non-exclusive factors are used to determine whether the defendant acted with reckless indifference: (1) the defendant's use of or awareness of the presence of a weapon or weapons; (2) the defendant's physical presence at the scene and opportunity to restrain confederates or aid the victim; (3) the duration of the crime; (4) the defendant's knowledge of any threat the confederates might represent; and (5) the defendant's efforts to minimize the risks. (*People v. Clark* (2016) 63 Cal.4th 522, 618–623 (*Clark*).)

law as amended by Senate Bill 1437. (§ 1172.6, subds. (c), (d)(3); *Strong*, at pp. 708, 709.) If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, must be vacated and the petitioner must be resentenced on the remaining charges. (§ 1172.6, subd. (d)(3).)

## III.

### *Proceedings on Petition for Resentencing*

In April 2021, Lopez petitioned for resentencing under former section 1170.95, now section 1172.6.[5] After appointing counsel, the trial court issued an order to show cause and scheduled the matter for an evidentiary hearing.

In its return, the People argued Lopez was ineligible for relief because the trial evidence proved beyond a reasonable doubt that she was guilty of first degree felony murder either (1) as a major participant in the underlying felonies who acted with reckless indifference to human life or (2) as an aider and abettor of the murder who acted with malice aforethought. In her reply to the return, Lopez disagreed and claimed the evidence did not support the conclusions she was either the actual killer, an aider and abettor who acted with malice aforethought, or a major participant who committed the underlying felonies with reckless indifference to human life. She also argued her youth (age 25 at the time of the murder) was a factor that further undermined the conclusion she acted with reckless indifference.

---

[5] The petition itself is not in the appellate record. However, on appeal the parties agree that a petition was filed. Although the trial judge who presided over the evidentiary hearing stated he had not seen the petition, the order to show cause stated the superior court was "in receipt of a Petition for Resentencing . . . filed by [Lopez]."

A.    *Evidentiary Hearing*

At the hearing, the People submitted on the trial transcripts and this court's opinion in *Maraglino*.  Lopez testified in her defense and offered testimony from two expert witnesses, pathologist Howard Robin and psychologist Kristina Malek.

1.    *Lopez's Testimony*

On direct examination, Lopez testified to having endured a difficult childhood.  She stated that her father hit her and she had memories that caused her to believe her paternal grandfather had sexually abused her.  Also, she was a lesbian, and she felt her family, who were churchgoers, "wanted [her] to stop being gay."

Lopez attended community college and started working as a CNA (certified nursing assistant) at age 20 or 21.  She was drawn to BDSM, as she "enjoyed pain and . . . drift[ed] into somewhere where enjoying pain was something that gave someone else pleasure."  At one point, she became involved with a couple, Heather and James.  She shared an apartment with James's son.  The son was abusive to her, and she hated him.  He was the victim in her ciphered abduction, torture, and homicide fantasy.  Lopez testified she authored the fantasy at Maraglino's urging as a kind of therapy.  On cross-examination, however, she admitted Maraglino could not read the secret code she used to write it, and the fantasy was her "private thoughts and [her] thoughts alone."

When Lopez met Maraglino and Perez, Lopez was about 23, Maraglino was 35 or 37, and Perez was in his late thirties or early forties.  Maraglino made Lopez feel accepted and like she "wasn't a freak."  Lopez entered a slave contract with Maraglino, and they had a collaring ceremony, which was "kind of being married in BDSM."  They would engage in play sessions in

18

which Lopez would take pleasure in receiving pain, and Maraglino would take pleasure in causing it. Maraglino also talked "quite a bit" to Lopez about her sexual fantasies, which included kidnapping scenarios.

Maraglino was controlling. Lopez explained that once she was with a mistress she no longer had rights: as a slave, her role was to do what she was told and not to question Maraglino.

Lopez worked until 5:00 on April 13, 2012. She planned to go to her family's house the next day with Maraglino and Hernandez, one of Maraglino's friends. Killgore was a friend of Hernandez. Maraglino "couldn't stand" Killgore. Maraglino and Hernandez would refer to Killgore as "the disease syphilis," so Lopez did as well. Lopez admitted saying to Maraglino and Hernandez that she would "walk [Killgore] off the plank" at the party, but she testified she was not actually planning on "doing something" to Killgore.

When Lopez arrived home from work to Maraglino's house in Fallbrook on April 13, Maraglino was helping Perez with his clothes. Lopez was told that Perez was going to downtown San Diego and Maraglino and Lopez would be having "a girls night." Lopez did not know where Perez was going and did not ask.

After Perez left, Maraglino and Lopez went to the grocery store in Maraglino's truck. When they went to check out, Maraglino did not have her wallet, so she told Lopez to "go out to the car and check." Lopez searched the truck but did not find the wallet, so she drove the truck back home, which took seven minutes. While parking, Lopez "nicked" her own car with the truck. She entered the house at the lower of its two levels—the same level as her bedroom, a former tool room, and an area she referred to as "the dungeon." When she entered, she saw the light on in the tool room and Perez

19

sitting on the stairs looking "distraught or distracted." Perez asked her where Maraglino was. Lopez said she was at the grocery store and Lopez had come home to retrieve her wallet. Perez "noticed [Lopez] was . . . anxious" and asked, "What's wrong?" Lopez told him she had hit Maraglino's truck "again." They went outside and examined the truck but found no damage.

Lopez then reentered the house, retrieved her own wallet, and returned to the store. She and Maraglino purchased their items, and at Maraglino's insistence they went straight home. Maraglino did not tell Lopez that Perez had just texted her to come home.

They arrived home at around 8:20. Maraglino told Lopez to wait a few minutes before entering the house but did not explain why. Lopez remained in the truck for "a couple minutes." Then she grabbed the groceries and entered the house through the downstairs entry. Inside, she saw a female in "a BDSM position"— on her hands and knees with her head on the ground. The female's head was turned away and Lopez did not recognize her. Lopez could see tape on the back of the female's head and assumed it covered her mouth. Lopez did not see signs that she was breathing and could not tell whether she was alive. Maraglino and Perez were "conversing" nearby. Lopez denied knowing what they were talking about; she explained they were talking quietly, and part of being a slave was "not listening when your owners are talking."

After standing there for around one minute, Lopez went upstairs to put away the groceries. She saw Maraglino come upstairs and return downstairs carrying handcuffs. Perez's truck drove away from the house 10 minutes later. Maraglino did not come back upstairs.

After Lopez finished putting away the groceries, she moved to the living room, which she said was technically a violation of the rules for slaves.

20

There, she purchased and watched the pay-per-view movie "The Adventures of Tintin." She testified she did not hear any sounds of BDSM play coming from downstairs. When asked whether she heard the sound of power tools, she responded that she took medication that gave her "sleep paralysis." Lopez testified she never saw the female again.

Lopez testified that Maraglino told her to write the confession letter. Lopez did not know how Killgore was killed; the details in the letter were supplied by Maraglino. The letter was designed to "piss off the cops" so they would believe Lopez was guilty without conducting an investigation. The plan was for Lopez to confess to committing the crimes and then kill herself. Maraglino told Lopez that if she did not commit suicide, Maraglino would kill Lopez, herself, and her unborn baby.

On cross-examination, Lopez admitted lying during custodial interviews with law enforcement, but claimed she did so at Maraglino's direction. She also admitted following Perez to Lake Skinner in the early morning hours of April 14, 2012, but denied knowing they were going there to dispose of Killgore's body. She further admitted discarding evidence, like a knife and handcuffs, in a porta-potty. And she agreed that she and Maraglino had purchased Windex "to wipe prints," but claimed they only used it inside Maraglino's truck.

2.      *Dr. Robin's Testimony*

Dr. Robin reviewed the medical examiner's investigative report and autopsy report, as well as transcripts of the medical examiner's testimony. He testified that Killgore's death was caused by ligature strangulation. Echoing the medical examiner's trial testimony, Robin testified that with strangulation, loss of consciousness normally occurs within 10 to 15 seconds

21

and death normally occurs within one to two minutes.[6] Robin stated that red blood cells were found in Killgore's lungs, but only a small amount, not enough to soak a pillow with blood.[7] Finally, based on larvae on Killgore's body, he opined that her body was deposited at Lake Skinner from "Saturday [April 14] at midnight going into Sunday [April] 15th." He testified this opinion was "not inconsistent or consistent with the death occurring 24 hours prior."

### 3. *Dr. Malek's Testimony*

Dr. Malek met with Lopez and administered psychological tests. Malek opined that Lopez suffers from complex trauma caused by childhood physical, emotional, and sexual abuse; persistent depressive disorder since childhood; and sexual masochism disorder. She also provisionally diagnosed Lopez with autism disorder. Lopez received elevated test scores for "severe aggression," although some instances in which Lopez reported acting aggressively were emotional outbursts rather than physical violence. Malek opined there was a power differential in Lopez's relationship with Maraglino, but acknowledged the dynamics of abuse within their relationship "may have been consensual."

## B. *Trial Court Ruling*

After taking the matter under submission, the trial court denied Lopez's petition in an oral ruling. The court began by stating it found Lopez's testimony to be credible in "some areas with regards to background" but did

---

[6] Dr. Robin did not address or indicate disagreement with the medical examiner's trial testimony that how fast death by strangulation occurs depends in part on whether pressure is applied, released, and applied again (which can delay death "for hours"), and that the amount of hemorrhaging in Killgore's eyes was consistent with pressure being applied and released.

[7] In her confession letter, Lopez wrote that Killgore "soaked [a] pillow with her harpy blood."

not find her testimony to be reasonable or credible "with regards to what happened on the day of the incident." The court also stated that Lopez's conviction for torture meant the jury found beyond a reasonable doubt that Killgore was alive when Lopez was participating in the incident.

The court then addressed the *Banks* and *Clark* factors (see fn. 4, *ante*) and made detailed factual findings on each factor. It based its findings largely on Lopez's admissions in the confession letter to using a Taser, pillow, and rope to kill Killgore and power tools to attempt to dismember her, the medical examiner's testimony corroborating these actions, and the torture conviction which further supported the conclusion Killgore was alive when Lopez participated in the crimes.

Starting with the *Banks* (major participant) factors, the court reasoned that although Lopez was not involved in planning the kidnapping, she did have a role in using lethal weapons, including because she admitted to using a Taser, pillow, and rope to kill. On the awareness of dangers factor, the court found that while Lopez understood the master-mistress-slave dynamic in Maraglino's household to be limited to consenting adults who used safety practices, "by the time [Lopez] was involved in the situation it would have been quite clear to her that this was not a consensual situation [with] safeguards . . . and that it was a very dangerous situation indeed." It also found, based on the language Lopez used when talking about Killgore, that Lopez appeared to adopt Maraglino's dislike of Killgore. With respect to presence at the scene and ability to prevent or facilitate the murder, the court found Lopez admitted in the confession letter to being present at the scene and strangling Killgore, and it found that after lethal force was used Lopez tried to dismember Killgore and then helped in disposing of her body.

23

Turning to the *Clark* (reckless indifference) factors, the court reasoned, based in large part on Lopez's statements in the confession letter, that she used or was aware of the presence of dangerous weapons and admitted to being present at the scene and killing Killgore. Based on cell phone data, the court found the duration of the underlying felonies was "significant"—from 7:37 (when Perez picked up Killgore) until "around [4] a.m." (when Killgore's body was deposited in Riverside County). As for Lopez's knowledge of her cohorts' likelihood of killing, the court found Maraglino had previously threatened a woman who was involved with Perez (i.e., Marina), and Maraglino had an intense dislike for Killgore, all of which was known to Lopez. Finally, the court found no indication Lopez made any effort to minimize the risk of the violence.

The court then addressed additional factors. It observed that the People cited "as another relevant factor" that Lopez had acted out a "long-held fantasy" of abduction, torture, killing and concealing, as evidenced by her ciphered writing, It also noted that the defense had pointed to the "catch-all" that Lopez was young at the time of the incident. Finally, the court referenced Lopez's confession letter and said it had given particular consideration to whether Lopez was willing to die for Maraglino. Having reviewed the photographs of Lopez's self-inflicted wounds, the court described the wounds as "extreme" and stated "[i]t was very clear . . . she did actually intend to kill herself at that time." The court found Lopez's willingness to kill herself for Maraglino to be "strong evidence" Lopez was also willing to kill on Maraglino's behalf to please Maraglino.

The court concluded based on "all these different factors" and "all the evidence" that Lopez would still be liable beyond a reasonable doubt under current felony murder law, because she was a major participant who acted

24

with reckless indifference to human life. It further found that "for the same reasons previously stated, that she would still be liable for murder beyond a reasonable doubt under a malice aforethought theory as well."

A minute order reflecting the denial of Lopez's petition was entered on September 12, 2023.

DISCUSSION

I.

*Relevant Legal Principles*

Lopez contends the record contains insufficient evidence to support a finding she was the actual killer or a major participant who acted with reckless indifference to human life. Such claims are evaluated under the substantial evidence standard of review. (*People v. Reyes* (2023) 14 Cal.5th 981, 988.) When applying this standard, we "examine the record independently for substantial evidence—that is, evidence which is reasonable, credible, and of solid value that would support a finding beyond a reasonable doubt." (*Banks*, *supra*, 61 Cal.4th at p. 804 [cleaned up].) "We review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the [trier of fact] could reasonably have deduced from the evidence. Conflicts and even testimony that is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*) [cleaned up].)

"The same standard governs in cases where the prosecution relies primarily on circumstantial evidence." (*Zamudio*, *supra*, 43 Cal.4th at p. 357.) We "presume, in support of the judgment, the existence of every fact

25

the trier of fact could reasonably deduce from the evidence, whether direct or circumstantial." (*Clark, supra,* 63 Cal.4th at p. 610.) We do not reweigh the evidence or reevaluate a witness's credibility; we look for substantial evidence. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27 (*Lindberg*); *People v. Manibusan* (2013) 58 Cal.4th 40, 87.) And " 'unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.' " (*People v. Ghobrial* (2018) 5 Cal.5th 250, 281 (*Ghobrial*).)

One of the foundational principles of appellate review is that "the [order] challenged on appeal is presumed correct, and it is the appellant's burden to affirmatively demonstrate error." (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.) Thus, when an appellant "claims on appeal that [her] conviction was based on insufficient evidence of one or more of the elements of the crime of which [s]he was convicted, we *must* begin with the presumption that the evidence of those elements *was* sufficient, and the [appellant] bears the burden of convincing us otherwise." (*Ibid.*)

To overcome the presumption of correctness, the appellant must raise in her opening brief a developed argument specifying how the evidence fails to support the factfinder's adverse findings. (See *People v. Stanley* (1995) 10 Cal.4th 764, 793 (*Stanley*) [when "an appellant makes a general assertion, unsupported by specific argument, regarding insufficiency of evidence," the reviewing court may treat the point as waived].) The failure to comply with these requirements allows the reviewing court to treat the point as forfeited. (See *People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9 (*Duff*) [challenge forfeited where not raised in opening brief]; *People v. Spector* (2011) 194 Cal.App.4th 1335, 1372, fn. 12 (*Spector*) [challenge forfeited where not properly raised as an independent issue in opening brief].)

26

## II.

*Lopez Fails To Demonstrate Insufficient Evidence Supports the Determination*
*She Aided and Abetted the Murder with Malice Aforethought*

The trial court's denial of Lopez's petition was based on the determinations she remained liable for murder (1) as a major participant in the underlying kidnapping or torture who acted with reckless indifference to human life, and (2) as an aider and abettor of the murder who acted with malice aforethought. These are independent grounds for denying a section 1172.6 petition. (*Strong, supra,* 13 Cal.5th at p. 703 ["Resentencing is available under [§ 1172.6] if the defendant neither killed nor intended to kill and was not 'a major participant in the underlying felony [who] acted with reckless indifference to human life, as described in subdivision (d) of [§] 190.2.' "]; see *People v. Harris* (2024) 105 Cal.App.5th 623, 631 [after Sen. Bill 1437, an aider and abettor in a murder "may still be criminally liable if that individual personally possesses malice aforethought, whether express or implied"].) To overcome the presumption that the denial of her petition was correct, Lopez bears the burden of showing both theories of liability are unsupported by substantial evidence.

She fails to do so. Her opening brief is devoid of any challenge to the trial court's determination she remained liable for murder under the second theory—i.e., as an aider and abettor who acted with malice aforethought. Instead, she has challenged the factual validity of an actual killer theory (which the court did not rely on for its ruling) and a major participant/reckless indifference theory.

In a footnote of her reply brief, apparently recognizing the omission, she asserts for the first time that "if the evidence fails to support a felony murder theory, which it does, it necessarily fails to support any theory of

direct liability." This is the entirety of her argument. In addition to being belated and relegated to a footnote, the apparent challenge to the viability of a direct aiding and abetting/malice aforethought theory is undeveloped. For these reasons, we deem the attempted challenge forfeited. (*Duff*, *supra*, 58 Cal.4th at p. 550, fn. 9; *Spector*, *supra*, 194 Cal.App.4th at p. 1372, fn. 12; see *People v. Rangel* (2016) 62 Cal.4th 1192, 1218 [argument forfeited where raised for first time in reply]; *People v. Lucatero* (2008) 166 Cal.App.4th 1110, 1115, fn. 1 ["A footnote is not a proper place to raise an argument on appeal."]; *Stanley*, *supra*, 10 Cal.4th at p. 793 [argument forfeited where appellant made only a "general assertion, unsupported by specific argument, regarding insufficiency of evidence"].)

Even if we were to consider the forfeited challenge, we would conclude that it lacks merit. In essence, Lopez's claim is that to the extent there is insufficient evidence to support the trial court's finding she was a major participant in the underlying felonies who acted with reckless indifference to human life, there is necessarily insufficient evidence to support the court's finding she was an aider and abettor in the murder who acted with malice aforethought. As we explain next, Lopez fails to establish the evidence is insufficient to support the finding she was a major participant who acted with reckless indifference. Because the premise of her challenge to the malice aforethought theory fails, the challenge itself also fails.[8]

---

[8] Because the trial court did not deny Lopez's petition on the theory she was the actual killer, we do not need to consider her contention that the record provides no credible basis for finding her to be an actual killer.

III.

*Lopez Fails To Show Insufficient Evidence Supports the Determination She Was a Major Participant in the Kidnapping and Torture Who Acted with Reckless Indifference to Human Life*

A.    *Major Participant*

Because the trial court found in favor of Lopez on the first of the *Banks* major participant factors, we need only consider Lopez's claims that the evidence is insufficient to support adverse findings on the second through fifth factors.

1.    *Second Factor—Role in Supplying or Using Lethal Weapons*

As we have mentioned, the trial court's resolution of this factor was primarily based on Lopez's statements in the confession letter that she used a Taser, pillow, and rope to kill Killgore and power tools to attempt to dismember her.  However, despite the importance of the confession letter to the court's finding, within the relevant section of her opening brief Lopez brings only a very limited challenge to the court's reliance on the letter.  She merely asserts, without explanation, that the letter is "patently fabricated" and its contents are therefore inherently improbable or physically impossible. (See *People v. Ennis* (2010) 190 Cal.App.4th 721, 729 (*Ennis*) [testimony may be rejected by a reviewing court when it is "inherently improbable or incredible, i.e., unbelievable per se, physically impossible or wholly unacceptable to reasonable minds" (cleaned up)].)  She offers no supporting reasoning or logic that would justify us in concluding the statements the court relied upon must be rejected as inherently improbable or physically impossible.  Her conclusory assertions fall short of a properly developed

29

appellate argument. For this reason alone, we reject her challenge.[9] (See *Stanley*, *supra*, 10 Cal.4th at p. 793 [it is not the role of the reviewing court to "construct a theory supportive of [the defendant's] innocence and inconsistent with the prosecution's version of the evidence"].)

Lopez does offer several developed arguments attacking particular statements in the letter as physically impossible or inherently improbable. But she does so within a different section of her opening brief, under a heading in which she contends the evidence is insufficient to prove she was the actual killer. We are not required to consider arguments raised under a different heading that concerns a different topic (particularly where, as here, we are not asked do so). (Cal. Rules of Court, rule 8.204(a)(1)(B) [appellate opening brief must state each point raised under a separate heading]; *Dinslage v. City and County of San Francisco* (2016) 5 Cal.App.5th 368, 377, fn. 3 (*Dinslage*) [court may disregard argument not set out under proper heading]). However, even if we were to consider Lopez's extraneous attacks on the confession letter, we would conclude they lack merit.

"To warrant the rejection of the statements given by a witness who has been believed by a [factfinder], there must exist either a physical impossibility that they are true, or their falsity must be apparent *without resorting to inferences or deductions*." (*Ennis*, *supra*, 190 Cal.App.4th at pp. 728–729, italics added [cleaned up].) "In other words, the challenged evidence must be improbable on its face." (*Ibid.* [cleaned up], quoting *People*

---

9 Lopez also attacks the credibility of Perez's testimony blaming her for the murder. As the People observe, however, the trial court did not mention Perez's testimony when ruling on Lopez's resentencing petition. And because Lopez's admissions in the confession letter on their own are sufficient to support the court's ruling (*Ghobrial*, *supra*, 5 Cal.5th at p. 281), we need not address her challenge to Perez's testimony.

*v. Mayberry* (1975) 15 Cal.3d 143, 150.)  This means "we do not compare it to other evidence (except, perhaps, certain universally accepted and judicially noticeable facts)." (*Ennis*, at p. 729.)

Although Lopez tries to demonstrate that certain statements in the letter fall into the category of evidence that is insufficient because it is inherently improbable or impossible, her arguments do not adhere to the foregoing rules.  Her specific contentions are:  (1) there is "no evidence" of a blood-stained pillow "or that [Killgore] bled profusely, or at all"; (2) the assertion Killgore arrived at Maraglino's home at 11:15 "made no sense" in light of cell phone data; (3) there is "no evidence" of the mutilation marks and bruises described in the letter "except for" the cutting injuries and bruises identified by the medical examiner; (4) "no physical evidence" tied Lopez to Killgore's death; (5) there is "no evidence" Killgore was bound or gagged with duct tape even though the letter stated this occurred; and (6) the letter states Killgore tried to make Perez jealous, which is similar to Perez's own cover-up story and shows the letter was designed to support his false story.

None of these contentions establishes the physical impossibility or inherent improbability of the referenced evidence, because all of them rely on comparisons with other evidence.  Determining whether certain facts asserted within the letter are corroborated by "no evidence" or "no physical evidence" requires a comparison with other evidence—i.e., the existence or nonexistence of corroborative evidence.  The same is true of her claim the statement about the time of Killgore's arrival "made no sense," which requires a comparison with cell phone data, and her claim that yet another statement was falsified because it was similar to Perez's version of events, because they require us to compare the letter with other evidence.  She therefore fails to show the specific statements challenged, much less the

31

letter as a whole, must be disregarded as inherently improbable or physically impossible.

    2.    *Third Factor—Awareness of Particular Dangers Posed by the Nature of the Crime, Weapons Used, or Past Experience or Conduct of the Other Participants*

Lopez's challenge to the sufficiency of the evidence supporting the third major participant factor fails because her arguments either impermissibly ask us to reweigh evidence or revisit credibility decisions, or they address evidence the trial court did not rely on when it made adverse factual findings on this factor.

Lopez's challenge is based in part on the claim it is "entirely plausible" given the length of time Perez was alone with Killgore (from 7:37 until approximately 8:20) that Killgore was already dead by the time Lopez arrived home from the grocery store with Maraglino. Alternatively, she claims that even if the killing occurred later, "nothing credible in the record" connects her to any part of the kidnapping, torture, or attempted sexual battery, and the most we can "credibly draw from" the evidence is she was involved only after the killing. She also argues that her testimony that she slept through any noises generated by the assaults on Killgore "is indeed reasonable." We reject these contentions as impermissible requests to reconsider the trial court's adverse credibility finding, reweigh the evidence and replace the court's factual findings with our own. (*Lindberg*, *supra*, 45 Cal.4th at p. 27 ["A reviewing court neither reweighs evidence nor reevaluates a witness's credibility."].)

Next, Lopez raises a number of arguments that are unsuccessful because they disregard the trial court's findings and the evidence on which the court relied. Lopez argues the "undisputed evidence" shows that as far as she knew, Perez and Maraglino were " 'safe' players" who respected people's

comfort zones. The court explicitly found as much, but it went on to resolve the awareness factor against Lopez based on the evidence she participated in the crimes. The court reasoned she would have known by the time of her involvement that the situation was dangerous to Killgore. Because Lopez does not address this dispositive finding by the court, she falls short of demonstrating error. Lopez also argues that Perez's prior acts of sexual violence were unknown to her, and the fantasies of Perez and Maraglino cannot be used against her because they were ruled inadmissible against her at trial. These attacks are similarly misplaced because the court did not rely on this evidence for its adverse finding on this (or any other) factor.

Finally, Lopez contends that her ciphered torture and homicide fantasy "cannot properly be considered as incriminating" because "[f]antasy is not reality" (*United States v. Curtin* (9th Cir. 2007) 489 F.3d 935, 961 (conc. opn. of Kleinfeld, J.) (*Curtin*)) and "[f]antasizing about committing a crime . . . is not a crime" (*United States v. Valle* (2d Cir. 2015) 807 F.3d 508, 511 (*Valle*)). We are not persuaded. First, Lopez fails to show she preserved her right to bring this challenge on appeal by objecting to the fantasy evidence on this ground in the trial court.[10] (See Evid. Code, § 353, subd. (a) [a finding "shall not be set aside" absent an objection to the evidence on the "specific ground" asserted on appeal].)

Even assuming the challenge has been preserved for appeal, Lopez does not convince us the trial court erred. The federal appellate decisions she cites

---

[10] We also note the ciphered fantasy was not one of the items of evidence the trial court relied on to resolve this factor against Lopez. However, the court did discuss the ciphered fantasy later in its ruling, characterizing it as "another relevant factor" cited by the People. Although it is not clear what weight the court gave this "factor," for the reasons we discuss Lopez fails to show any reliance on the factor was erroneous.

are not controlling (*People v. Zapien* (1993) 4 Cal.4th 929, 989) nor do we find them persuasive in the context of this case. *Valle* was a prosecution for a conspiracy that was "entirely virtual [in] nature" (*Valle*, *supra*, 807 F.3d at p. 517), in which internet fantasy chats and emails were the sole evidence on which the prosecution built its case (*id.* at p. 516). This case, by contrast, involves a homicide rather than an inchoate crime, as well as a far more comprehensive body of evidence, and thus does not raise the same concerns as *Valle* about criminalizing private sexual fantasy or drawing lines between fantasy and actual criminal intent. *Curtin* involved an alleged use of an interstate facility to attempt to persuade a minor to engage in sexual acts. (*Curtin*, *supra*, 489 F.3d at p. 936.) There the question on appeal was whether "stories" found in the defendant's possession could be used to show his intent. (*Id.* at p. 957.) Judge Kleinfeld's concurrence is an impassioned rejection of the relevance of such evidence based on the First Amendment implications of criminalizing the private possession of reading material. (*Curtin*, at pp. 959–960 (conc. opn. of Kleinfeld, J.).) Unlike *Curtin*, Lopez previously authored (as opposed to merely possessed) a torture and homicide fantasy about a person she disliked in reality, making the fantasy more relevant to her mental state, and less evocative of First Amendment concerns, than the "stories" discovered on Curtin's computer. In addition, as the People point out, our Supreme Court has impliedly approved the use of fantasy evidence to show the existence of a culpable motive. (*People v. Davis* (2009) 46 Cal.4th 539, 604 [defendant's prior crimes were relevant and admissible to prove motive to sexually assault the victim, Polly Klaas, where the defendant admitted having sexual fantasies about assaulting and binding the prior victims].)

### 3. *Remaining Major Participant Factors*

Lopez challenges the fourth and fifth major participant factors all in a single, four-sentence paragraph. She does not raise new arguments. Instead, she merely asserts that "much the same analysis drives [these] factors," without indicating which "analysis" she is referring to. If this reference to an earlier analysis is meant to incorporate her prior arguments on the major participant factors, we have already concluded those arguments lack merit. If the reference is meant to refer back to arguments in the section of her opening brief in which she challenges the sufficiency of the evidence to support a finding she was the actual killer, we are not required to consider those arguments, particularly because Lopez has not asked us to do so. (*Dinslage*, *supra*, 5 Cal.App.5th at p. 377, fn. 3.)

In any event, the only other relevant arguments within this part of the opening brief are meritless challenges to the conclusion Lopez participated in torturing or kidnapping Killgore. Lopez's argument that she did not participate in torturing Killgore is that no torture occurred at all because none of the injuries inflicted on Killgore satisfied both elements of the crime. (See CALCRIM No. 810 (Torture) [crime requires proof that (1) the "defendant inflicted *great bodily injury* on someone else" and (2) when inflicting the injury, "the defendant intended to cause *cruel or extreme pain and suffering* for the purpose of revenge, extortion, persuasion, or for any sadistic purpose" (italics added)].)

We need look no further than the evidence of Killgore's strangulation to reject this claim. The medical examiner testified at trial that the amount of hemorrhaging in Killgore's eyes was consistent with strangulation pressure being applied and released (thus causing more blood to accumulate in the eyes), an experience he described as likely to be painful and to involve

suffering.  Lopez tries to downplay this testimony by claiming the examiner compared the pain level of strangulation to a chokehold during childhood horseplay.  This is not accurate.  In explaining to the jury why Killgore was likely to have experienced pain, the examiner testified the strangulation pressure inflicted on her would have been "*a greater degree of force*" than a childhood chokehold.  (Italics added.)  He did not state the pain levels were equivalent.

Lopez also contends she could not have participated in the kidnapping of Killgore because she arrived home after Killgore had already been captured and there is no evidence she moved Killgore while Killgore was alive.  (See CALCRIM No. 1215 (Kidnapping, § 207, subd. (a)) [elements of kidnapping include that the defendant "took, held, or detained another person by using force or by instilling reasonable fear" and "moved the other person . . . a substantial distance"].)  This argument fails, however, because it overlooks essential principles of Lopez's criminal liability and the evidence supporting them.  Lopez fails to acknowledge or address the aiding and abetting theory of liability with which the jury was instructed.  (See CALCRIM No. 401 [defendant is guilty of aiding and abetting if, knowing of the perpetrator's criminal intent, the defendant aided and abetted the perpetrator's commission of the crime "[b]efore or during the commission of the crime"].)  She also fails to recognize that kidnapping is a continuing offense that persists "until such time as the kidnapper releases or otherwise disposes of the victim and has reached a place of temporary safety."  (*People v. Barnett* (1998) 17 Cal.4th 1044, 1159.)  We additionally note that the statements in the confession letter that the trial court accepted as true support her conviction as an aider and abettor of the kidnapping, because they described specific actions taken by Lopez to restrain or assist in

36

restraining Killgore before Killgore was disposed of (e.g., grabbing Killgore's ankle; slamming Killgore into the stairs; wrapping a rope around Killgore's neck).[11]

B.    *Reckless Indifference to Human Life*

Next, Lopez asserts a series of perfunctory challenges to the sufficiency of the evidence supporting the trial court's resolution of the *Clark* reckless indifference factors.  These challenges fail, largely because they are undeveloped.

On the first factor (knowledge, use and number of weapons), she merely asserts "based on the above analysis" that the evidence fails to establish this factor, without indicating which analysis she is referring to.  Our rejection of her prior arguments compels us to reject this one as well.

Lopez's challenge to the second reckless indifference factor (physical presence and opportunity to restrain the crime and/or aid the victim) consists of the bare assertion that "[n]o 'evidence that is reasonable, credible, and of solid value' supports a finding that Lopez was even aware of her co-defendants' plans or intentions with Killgore on the night of the incident, much less that she was present for the killing, had the opportunity to restrain the crime, and/or the opportunity to aid Killgore."  Her challenge to the third reckless indifference factor (duration of the felony) is an equally conclusory assertion that "the evidence fails to show anything more than the

_____

[11]    We need not and do not address the People's argument that Lopez is prohibited under the doctrine of issue preclusion from questioning the validity of the conclusions she participated in torturing and kidnapping Killgore, because we have rejected Lopez's arguments on the merits.  And we do not address Lopez's additional challenge to the sufficiency of the evidence supporting her attempted sexual assault conviction because it is not a predicate for felony murder.  (See § 189, subd. (a) [listing predicate felonies].)

act of assisting the perpetrators after the conduct that caused the death [was] complete." We reject both challenges because they are undeveloped (*Stanley*, *supra*, 10 Cal.4th at p. 793) and impermissibly ask us to reject the trial court's credibility findings and reweigh the evidence (*Lindberg*, *supra*, 45 Cal.4th at p. 27).

Turning to the fourth reckless indifference factor (knowledge of cohort's likelihood of killing), Lopez contends no substantial evidence supports the conclusion she had the ability to subjectively appreciate the risk of danger. (See *Clark*, *supra*, 63 Cal.4th at p. 617 [knowledge of likelihood of killing has objective and subjective components].) This is so, she claims, "because of the evidence" of her emotional and psychological instabilities. We disagree there is insufficient evidence supporting this factor. Lopez's own testimony supported the opposite conclusion. She testified that as a CNA she possessed an automatic tendency to observe vital signs like indications of breathing. The trial court could properly conclude on the basis of this and other evidence, including that she personally strangled Killgore, that Lopez possessed the necessary subjective appreciation of the consequences of her and her cohorts' actions.

Lopez's only argument on the fifth reckless indifference factor (efforts to minimize the risks of violence) is that this factor cannot be held against her "[b]ased on the foregoing analysis." As we have rejected Lopez's earlier analyses, we reject this argument as well.

C.  *Youth Factor*

Finally, Lopez contends the trial court erroneously failed to consider her youth at the time of the incident as a factor in its reckless indifference analysis. However, the record shows the court did, in fact, consider this factor.

Since at least 2021, courts have recognized that a defendant's youth at the time of the felony victim's death is relevant to the reckless indifference analysis. (See *People v. Harris* (2021) 60 Cal.App.5th 939, 960 (*Harris*) ["given Harris's youth at the time of the crime [(17 years old),] . . . it is far from clear that Harris was actually aware of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants" (cleaned up)]; *In re Moore* (2021) 68 Cal.App.5th 434, 453 (*Moore*) ["It is well recognized that children generally are less mature and responsible than adults and often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them. As a result, the law has historically reflected the same assumption that children characteristically lack the capacity to exercise mature judgment and possess only an incomplete ability to understand the world around them." (Cleaned up.)].)

In two cases decided soon after *Harris* and *Moore*, trial courts were determined to have erroneously failed to consider the defendant's youth before denying resentencing under former section 1170.95, now section 1172.6. (*People v. Jones* (2022) 86 Cal.App.5th 1076, 1091–1093 (*Jones*); *People v. Oliver* (2023) 90 Cal.App.5th 466, 488 (*Oliver*).) The trial court in *Jones* gave a "detailed explanation" for denying resentencing but "did not mention Jones's age [(20 years old)] or maturity level" at the time of the crime. (*Jones*, at p. 1091.) The Court of Appeal recognized that ordinarily, a trial court is presumed to have followed the law and "duly considered the evidence," and "the fact that a court did not specifically mention certain evidence does not mean that the court 'ignored' that evidence." (*Id.* at p. 1092.) It noted, however, that the trial court issued its decision only weeks after *Harris* was decided and months before *Moore* was decided. (*Jones*, at

39

p. 1092.)  Given the state of the law when the trial court issued its ruling, the appellate court found it unlikely the trial court would have known to consider the defendant's youth and maturity level, "particularly to the extent now required by cases issued after [the resentencing] hearing."  (*Ibid.*)

In *Oliver*, the trial court denied the defendant's petition for resentencing in December 2020, before either *Harris* or *Moore* was decided.  (*Oliver*, *supra*, 90 Cal.App.5th at p. 488.)  And in seeking resentencing, defense counsel did not argue that youth was a factor weighing against Oliver's culpability.  (*Ibid.*)  The appellate court found that "[u]nder these circumstances" it was unlikely the trial court would have known to consider Oliver's age and maturity level " 'particularly to the extent now required by cases issued after [the resentencing] hearing.' "  (*Ibid.*, quoting *Jones*, *supra*, 86 Cal.App.5th at p. 1092.)

In this case, the People argue, and we agree, the procedural facts are distinguishable from *Jones* and *Oliver* and point to the conclusion the trial court did not fail to give due consideration to Lopez's youth and associated characteristics (e.g., susceptibility to peer pressure).  Unlike *Jones* and *Oliver*, the trial court issued its decision in September 2023, over a year after *Moore* and *Harris* were decided.

Unlike *Oliver*, defense counsel did not fail to point to Lopez's youth as a factor that mitigated her culpability.  To the contrary, in replying to the People's return to the order to show cause, defense counsel both cited and quoted *Moore*, urged the trial court to take Lopez's age and maturity into account, and argued her codefendants' ages were also "significant."

Unlike *Jones*, the record in this case is not silent as to whether the trial court actually considered Lopez's youth in reaching its decision.  At the start of the hearing, the court stated it had read Lopez's reply to the People's

40

return, an affirmative indication it was aware of Lopez's reliance on the youth factor and its relevance to her mental state under *Moore*. When addressing the factors it evaluated in reaching its ruling, the court specifically stated, "The Defense also points to a catch-all that the Defendant was young, *which she was at the time when this incident occurred*," (italics added), demonstrating it was not only aware of the defense argument but agreed Lopez was "young" at the time of the incident. The court then stated it had "look[ed] at *all these different factors*" in concluding Lopez was a major participant who acted with reckless indifference to human life, another indication it considered Lopez's youth in reaching its decision. (Italics added.) It also stated it had considered the testimony of Dr. Malek, an indication it was aware of and considered Lopez's symptoms of childhood trauma.

Given the timing of the trial court's decision vis-á-vis *Harris* and *Moore* and the affirmative indications the court was aware of and considered Lopez's youth in reaching its decision, we have no reason to doubt the trial court followed the law and "duly considered the evidence." (*Jones*, *supra*, 86 Cal.App.5th at p. 1092.)

In reply, Lopez argues for the first time that "the youth factor, [whether] taken individually or collectively with the other evidence, precludes a finding [she] acted with the requisite 'reckless indifference to human life.' (*People v. Keel* (2022) 84 Cal.App.5th 546, 562–563 [(*Keel*)].)" It is not clear whether this argument is meant to refute the People's claim that any failure to address the youth factor was harmless, or whether it is meant to assert a new error based on the failure of the trial court to give sufficient weight to the youth factor even assuming it did consider it. In either case, we reject the claim.

41

To the extent Lopez is responding to the People's harmlessness argument, we have no occasion to consider harmlessness because we have found no error. To the extent Lopez is raising a new argument, it is forfeited because it is belated and unaccompanied by an explanation for the delay. (*Duff, supra*, 58 Cal.4th at p. 550, fn. 9; *Spector, supra*, 194 Cal.App.4th at p. 1372, fn. 12.) In any event, the argument is unpersuasive. Lopez does not cite a case reversing a denial of resentencing based solely on the defendant's youth at the time of the offense. Instead, she relies on *Keel*, in which this court found the defendant's age of 15 at the time of the crimes to be an additional factor which, when considered in light of the conclusion that the evidence was insufficient to support adverse findings on several *Clark* factors, precluded the determination that he acted with reckless indifference to human life. (*Keel, supra*, 84 Cal.App.5th at pp. 562–563.) *Keel* is inapposite. Here we have not found the evidence insufficient to support adverse findings on any of the *Clark* reckless indifference factors.

DISPOSITION

The order is affirmed.

DO, J.

WE CONCUR:

McCONNELL, P. J.

KELETY, J.

42